UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **GERALDINE COMBS** | * | **CIVIL ACTION NO. 16-1072** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **NANCY A. BERRYHILL, ACTING COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

### REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

### Background & Procedural History

Geraldine Combs filed the instant applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income payments on June 26, 2014. (Tr. 143-156). She alleged disability as of August 3, 2011,[1] because of back aches, high blood pressure, hip bone degeneration, acid reflux, and depression. (Tr. 164, 167). The state agency denied the claims at the initial stage of the administrative process. (Tr. 64-89, 92-99). Thereafter, Combs requested and received a November 13, 2015, hearing before an Administrative Law Judge ("ALJ"). (Tr. 31-63). However, in a March 16, 2016, written decision, the ALJ determined that Combs was

---

[1] Combs filed prior applications on July 30, 2010, which were denied by an Administrative Law Judge on August 2, 2011. (Tr. 67). The Appeals Council denied review. *Id*.

not disabled under the Social Security Act, finding at step four of the sequential evaluation process that she was able to return to past relevant work, or alternatively at step five, that she could make an adjustment to work that exists in substantial numbers in the national economy. (Tr. 12-27). Combs sought review of the adverse decision before the Appeals Council. On June 9, 2016, however, the Appeals Council denied Comb's request for review; thus the ALJ's decision became the final decision of the Commissioner. (Tr. 1-4).

On July 20, 2016, Combs filed the instant complaint for judicial review of the Commissioner's decision. Succinctly restated, she alleges the following errors,

1) for various reasons, the ALJ's residual functional capacity assessment is not supported by substantial evidence; and

2) the ALJ's step four and alternative step five determinations are tainted because the ALJ's hypothetical to the vocational expert did not include all of plaintiff's limitations of functioning.

### Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial

evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

## **Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A). Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1) An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2) An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

    (3)     An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

    (4)     If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

    (5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## ALJ's Findings

**I.     Steps One, Two, and Three**

The ALJ determined at step one of the sequential evaluation process that the claimant had not engaged in substantial gainful activity during the relevant period. (Tr. 17-18). At step two, she found that the claimant suffers severe impairments of affective disorder, anxiety disorder, degenerative joint disease, and arthritis. *Id.*[2] She concluded, however, that the impairments were

---

[2] She further found that the claimant's medically determinable impairments of GERD, decreased vision, and hypertension were not severe. *Id.*

not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process. (Tr. 18-22).

**II.    Residual Functional Capacity**

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform medium work,[3] except that she can never climb ladders, ropes, or scaffolds, and never work around unprotected heights. (Tr. 23-25). She also is limited to simple tasks, with frequent interaction of supervisors, co-workers, and the public. *Id*.

---

[3]    Medium work is defined and explained by Social Security Ruling 83-10:
> [t]he regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms.
>
> The considerable lifting required for the full range of medium work usually requires frequent bending-stooping. (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist). Flexibility of the knees as well as the torso is important for this activity. (Crouching is bending both the legs and spine in order to bend the body downward and forward). However, there are a relatively few occupations in the national economy which require exertion in terms of weights that must be lifted at times (or involve equivalent exertion in pushing or pulling), but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck driver (semi-skilled jobs). In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

Social Security Ruling 83-10.

**III.     Steps Four and Five**

At step four, the ALJ employed a vocational expert ("VE") to find that Combs was able to return to her past relevant work as a hand packager as that job is performed in the national economy. (Tr. 25, 58).[4]

The ALJ also proceeded to make an alternative step five finding. At this step, the ALJ determined that the claimant was an individual "closely approaching advanced age" on the alleged disability onset date, but subsequently changed age categories to "advanced age." (Tr. 25-27). She also had a high school education with the ability to communicate in English. *Id.* Transferability of skills was not at issue because her past relevant work was unskilled. *Id.*

The ALJ then observed that given the claimant's vocational factors, and if she had an RFC that did not include any non-exertional limitations, the Medical-Vocational Guidelines would direct a finding of not disabled. 20 C.F.R. § 404.1569; Rules 203.14 and 203.21, Table 3, Appendix 2, Subpart P, Regulations No. 4. *Id.* However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted the VE to determine whether, and to what extent the additional limitations eroded the occupational base for medium work. *Id.* In response, the VE identified the representative jobs of clean up worker, – medium, *Dictionary of Occupational Titles* ("DOT") Code # 381.687-018; hospital worker, – medium, DOT # 323.687-010; and detailer, – medium, DOT # 915.687-034. *Id.*[5]

---

[4]  Past relevant work is defined as "the actual demands of past work or 'the functional demands . . . of the occupation as generally required by employers throughout the national economy.'" *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987) (citing, Social Security Ruling 82-61).

[5]  The VE responded that for the cleanup worker job there were 12,893 positions nationwide and 185 in Louisiana; for the hospital worker job there were 43,340 positions nationwide, and 641 in Louisiana; for the detailer job, there were 53,537 positions nationwide and 634 in Louisiana. (Tr. 26, 59-62). This incidence of work constitutes a significant number

## Analysis

**I.     Residual Functional Capacity**

    a)     <u>Non-Exhaustive Chronology of Relevant Medical Evidence</u>

On September 28, 2010, plaintiff's treating psychologist, David Boyle, Ph.D., noted that Combs was doing better. (Tr. 233-234). She was trying to return to work for three to four hours per day for two weeks. *Id*.

On October 15, 2010, Dr. Boyle documented that plaintiff was afraid to drive and had not driven in ten years. (Tr. 234). He recommended that she drive for five minutes per day. *Id*.

On November 18, 2010, Boyle's treatment notes reflect that plaintiff was better, but not totally compliant. (Tr. 234). He recommended that she drive for ten minutes, three times per week and to sit in the back of church if she became sad. *Id*.

On December 20, 2010, Boyle indicated that Combs was driving more now. (Tr. 234). She went to church and felt okay. *Id*. He advised her to go clean out a closet or drawer every time she felt bad. *Id*.

On March 1, 2011, Dr. Boyle noted that Combs had tried for disability, but was denied. (Tr. 234). She still was not driving, but was attending church. *Id*. He recommended that she try driving for five minutes per day and to look into CNA training. *Id*.

On April 1, 2011, Combs reported that she was no better. (Tr. 234). They discussed driving without fear. *Id*. He recommended that she try driving short distances with her husband on a regular basis. *Id*.

---

of jobs in the "national economy." 42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

On May 2, 2011, Combs still was non-compliant. (Tr. 234-235). They discussed her fear of noises. *Id*. Boyle advised her to drive around Oak Ridge with her husband. *Id*. He also advised her to visit her old workplace for one to two hours and to report back. *Id*.

On June 3, 2011, Boyle met with Combs and her husband. (Tr. 235). Combs still refused to drive very much. *Id*. She was afraid to drive over bridges. *Id*. She visited the factory for 15 minutes. *Id*. She said she enjoyed it, and had no problems – no panic, no anxiety. *Id*. She missed the people there. *Id*. Combs gave Boyle a paper to fill out for disability, but it was supposed to be completed by a psychiatrist. *Id*. Boyle referred Combs to three different psychiatrists who could complete the form. *Id*. Boyle asked her whether she really wanted to receive therapy to get better or did she want disability. *Id*. Combs replied, " Honestly, I want the disability." *Id*. She was not interested in counseling. *Id*. Boyle diagnosed malingering and generalized anxiety. *Id*. The plan was for her to see an M.D. to complete her paperwork. *Id*. If she wished, he could offer her a program of systematic desensitization for anxiety and worry. *Id*. She was to return in six months or call sooner, if needed. *Id*.

A July 26, 2011 x-ray of the right knee showed mild degenerative changes in the medial compartment of the right knee. (Tr. 250). No joint diffusion was seen. *Id*.

On December 2, 2011, Boyle briefly met with Combs. (Tr. 235-236). She had been denied disability. *Id*. She reported that she was less anxious with significantly fewer panic attacks. *Id*. She also went places, such as church and Wal-Mart. *Id*. She wanted to return to part-time work. *Id*. She was to investigate jobs at Wal-Mart, teacher's aide, bank teller, etc. *Id*.

On January 27, 2012, Boyle briefly met with Combs. (Tr. 236). She had had only two panic attacks in the past two months. *Id*. She was learning to handle them. *Id*. She still wanted to obtain a part-time job soon. *Id*.

On December 9, 2013, Combs was seen by William Kintzing, M.D., at University Health-Monroe. (Tr. 296-297). She reported that she had fallen on her left knee while at church. (Tr. 296). She added that her left knee and hip sometimes hurt, but not that day. *Id*. She had a history of anxiety and depression, for which she was followed by David Boyle, whom she last saw on January 27, 2012. *Id*. However, she stated that as long as she took her Paxil, she continued to do well. *Id*. She sometimes had swelling in her hands and fingers that occasionally hurt. *Id*. Kintzing observed no ulnar deviation, nor any localized joint swelling or tenderness. *Id*. He diagnosed anemia, resolved; anxiety and depression controlled on Paxil; and occasional swelling of the hands. *Id*.

Combs returned to Dr. Kintzing on June 23, 2014. (Tr. 310-313). She had chronic hypertension that was uncontrolled. *Id*. She reported that she took her medication when she felt that her blood pressure was high. *Id*. Kintzing noted compliance problems. *Id*. She had normal mood, affect, judgment, and thought content. *Id*. Kintzing diagnosed gastroesophageal reflux disease ("GERD") and hypertension. *Id*.

At the request of the state agency, Combs was seen by consultative physician, David Hebert, M.D., on October 15, 2014. (Tr. 316-319). At that time, Combs complained of backaches, high blood pressure, bone deterioration, acid reflux disease, and depression. *Id*. She reported chronic shoulder and hip pain for at least the last ten years. *Id*. She said that her hips and shoulders hurt so much that she could not perform her regular work. *Id*. She also reported a lot of chronic lumbar pain, and pain between her shoulders. *Id*. She admitted that her Paxil helped her with her depression. *Id*.

Upon examination, Combs had no difficulty ambulating about the office. *Id*. Her lumbar spine exhibited a full range of motion. *Id*. Straight leg raise was negative. *Id*. Motor strength

was 5/5 in all extremities. *Id*. Hand dexterity, grasping ability, and fine-hand coordination all were excellent. *Id*. There were no obvious signs of depression or anxiety. *Id*. X-rays of the lumbar spine showed no evidence of osteoarthritis, degenerative disc disease, misalignments or previous fractures. *Id*. Both hip joints appeared to be completely normal. *Id*.

Hebert diagnosed chronic lumbar spine pain syndrome with no significant abnormalities in function; non-specific arthralgias of the shoulders and hips; arterial hypertension, well-controlled; history of GERD, and history of major depressive disorder, essentially in remission. *Id*. He saw no reason why Combs could not perform routine walking, sitting, standing, carrying, and lifting in an eight hour workday. *Id*. Mentally, she was alert, coherent, logical, and quite functional. *Id*.

At the request of the state agency, Combs was seen by consultative psychologist, Jon Haag, Psy.D., on November 19, 2014. (322-324). Combs reported that she was unable to work because she sometimes felt dizzy, and because of panic attacks. *Id*. She first was diagnosed with anxiety about six years earlier. *Id*. She reported that Paxil was moderately helpful in reducing her symptoms. *Id*. Social functioning was moderately impaired. *Id*. The only impairment in her activities of daily living was driving. *Id*. She completed most of the daily housework. *Id*. She typically spent time completing housework, taking a walk, or spending time outside if the weather permitted. *Id*. She expressed her anxiety via nervousness and dizziness. *Id*. She had these spells less than once per week. *Id*. She did not appear to be acutely depressed or anxious. *Id*. Working memory and concentration were moderately impaired. *Id*. However, she was able to function adequately in this area. *Id*. She understood and followed simple instructions without difficulty. *Id*.

Haag diagnosed panic disorder. *Id*. She had a history of mild panic disorder, with an

onset six years earlier. *Id*. Combs could tolerate simple social interaction on a limited basis. *Id*. For example, in small groups of two or three people in a moderately paced environment, she should have little to no difficulties. *Id*. Her working memory and concentration were moderately impacted such as to impair her ability to remember lengthy instructions. *Id*. Prognosis for her continued improvement was good. *Id*.

On December 9, 2014, non-examining agency psychologist, Burnard Pearce, Ph.D., reviewed the record and found that Combs suffered from the medically determinable impairment of anxiety disorder, which was a severe impairment. (Tr. 70-71). He also completed a mental residual functional capacity assessment wherein he found that Combs's ability to carry-out detailed instructions was moderately limited. (Tr. 74-75). In addition, her ability to interact appropriately with the general public was moderately limited. *Id*. However, her ability to get along with co-workers or peers was not significantly limited. *Id*. Pearce opined that Combs was able to perform simple and some complex tasks. *Id*. She also could relate to others on a superficial work basis, and adapt to work situations. *Id*.

On December 10, 2014, non-examining agency physician, Judy Marks-Snelling, D.O.,[6] reviewed the record and opined that Combs occasionally could lift and/or carry 50 pounds, and frequently lift and/or carry 25 pounds. (Tr. 72-74). She could stand, walk, and/or sit for about six hours in an eight hour workday. *Id*. Marks-Snelling endorsed no other limitations of functioning. *Id*.

On February 12, 2015, Combs went to Northeast Delta Human Services Authority for a psychosocial assessment. (Tr. 328-331). Combs reported that she enjoyed doing her hair, sewing, watching television, and shopping. *Id*. The counselor noted possible mild cognitive

---

[6] Doctors of Osteopathic Medicine are acceptable medical sources.

impairment, and diagnosed unspecified anxiety disorder. *Id*.

On March 6, 2015, Combs returned to Bastrop Behavioral Health Clinic where she reported that she thought her panic attacks were brought on by being around too many people. (Tr. 347). She also discussed stress related to her care of an eleven year old great niece. *Id*.

On March 20, 2015, Combs told her therapist that she was feeling more anxious, with some depression. (Tr. 346).

On April 17, 2015, Combs was seen at Bastrop Behavioral Health for a psychotherapy session. (Tr. 344). Combs reported that she had to find "another job." *Id*. She had been in conflict with the mother of the child she was caring for. *Id*. She could not identify a fear with regard to being in a group of people. *Id*.

On April 26, 2015, Combs went to University Health-Monroe where she was seen by Norman Boyd Williams, M.D. (Tr. 365-366). She was negative for myalgias, arthralgias, and neck pain. (Tr. 365). Williams diagnosed an upper respiratory infection. *Id*.

On July 7, 2015, Combs returned to University Health-Monroe and was seen by nurse practitioner, Sidney Turner McKinley. (Tr. 377-381). She was positive for myalgias, joint swelling, and arthralgias. *Id*. She also had edema and tenderness. *Id*. X-rays of the lumbar spine showed mild degenerative disc and joint disease. *Id*. Nevertheless, the nurse practitioner diagnosed hypertension, GERD, and anxiety. *Id*.

      b)    <u>Discussion</u>

In her decision, the ALJ reviewed the available evidence, including the hearing testimony, plaintiff's activities of daily living, treatment records, and the impressions of the treating, consultative, and agency acceptable medical sources. (Tr. 19-25). In deriving plaintiff's RFC, the ALJ assigned "great weight" to the opinion of Dr. Haag because it was consistent with the

record that showed the claimant could follow simple instructions. *Id*. She assigned "great weight" to the opinion of Dr. Pearce because the record reflected that the claimant experienced moderate difficulties in carrying out complex instructions and had problems with anxiety. *Id*. She also assigned "some . . . but not great weight" to Dr. Hebert's opinion because the record supported greater limitations. *Id*. Finally, she assigned "great weight" to Dr. Marks-Snelling's assessment because it was consistent with the record showing minimal limitations from physical impairments. *Id*.

Plaintiff challenges the ALJ's RFC on various grounds. She initially contends that the ALJ erred because she did not perform a function-by-function assessment of the effects of plaintiff's physical impairments. However, the ALJ assigned "great weight" to the findings of Dr. Marks-Snelling who *did* issue a function-by-function assessment of the effects of plaintiff's physical impairments, and which was consistent with the requirements for medium work. *Compare* Tr. 72-73 with SSR 83-10.

Plaintiff also argues that the ALJ was obliged to obtain an updated medical opinion because of renewed pain symptoms she conveyed to the nurse practitioner at a July 7, 2015, visit. However, a nurse practitioner is not an acceptable medical source. Even if he were, he did not diagnose any musculo-skeletal impairments stemming from plaintiff's subjective complaints and the minimal objective test findings. *See* Tr. 377-381. Thus, the record does not support a material deterioration of plaintiff's physical condition during the relevant period such as to undermine the ALJ's physical RFC.

Plaintiff next contends that, despite the ALJ's purporting to assign "great weight" to the findings of Dr. Haag, she inexplicably omitted three limitations recognized by Dr. Haag: 1) that plaintiff's memory and concentration were moderately impaired such that she could not

13

remember lengthy instructions; 2) that she would have "difficulty transporting herself to the workplace because of anxiety over driving"; and 3) that she could tolerate only "small groups of two or three people in a moderately paced environment." Of course, although "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion,"[7] the ALJ cannot reject a medical opinion without an explanation supported by good cause. *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).

The court observes that the ALJ limited plaintiff to simple tasks. Courts in this circuit have held that an RFC limited to simple work reasonably incorporates a moderate or even *marked* limitation in concentration, persistence, or pace. *Reid v. Astrue*, Civil Action No. 10-0237, 2011 WL 4101302 (S.D. Miss. Aug. 15, 2011) *report and recommendation adopted,* 2011 WL 4101277 (S.D. Miss. Sept. 8, 2011); *Madrid v. Colvin*, Civil Action No. 12-800, 2013 WL 6641305 (N.D. Tex. Dec. 17, 2013); *Cornejo v. Colvin*, Civil Action No. 11-470, 2013 WL 2539710 (W.D. Tex. June 7, 2013). Here, plaintiff's past relevant work, plus the other jobs identified by the VE all had an "SVP" of 2, which is considered unskilled work,[8] and thus, by definition, "work which needs little or no judgment to do *simple* duties that can be learned on the job in a short period of time." (Social Security Ruling 83-10 (emphasis added)).

Plaintiff further emphasizes that the jobs identified by the VE contemplate a reasoning level of "2," which requires the ability carry out "detailed, but uninvolved written or oral instructions," and, according to plaintiff, is inconsistent with plaintiff's inability to recall lengthy

---

[7] *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation and internal quotation marks omitted).

[8] *See* TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS (SSR-00-4p).

instructions. To the contrary, however, other courts have recognized that,

> the use of the word "detailed" in the DOT is not equivalent to the word "detailed' as used in the Social Security regulations. In the DOT, a reasoning level of 2 means the worker must be able to follow "detailed" instructions which are "uninvolved." Therefore, a DOT reasoning level of two is consistent with an residual functional capacity to perform simple, routine, repetitive work tasks.

*Adams v. Astrue*, No. 07-1248, 2008 WL 2812835, at *3 (W.D. La. June 30, 2008).

This court agrees.

Furthermore, as in *Adams, supra*, Combs, represented at the hearing by able counsel, eschewed the opportunity to cross-examine the VE regarding the alleged discrepancy now raised on appeal. The Fifth Circuit has recognized in these circumstances that

> claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing.

*Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000).

Plaintiff next complains that the ALJ failed to recognize her inability to transport herself to the job site. However, in 2010, plaintiff reported that she had not driven in ten years. (Tr. 234). Consequently, her professed inability to drive did not undermine her capacity to work. Rather, it is apparent that she could overcome this circumstance by calling on family or friends, taking public transportation, or even re-locating within walking distance to her job site.

Finally, plaintiff contends that the ALJ's RFC limiting her to "frequent" interaction with supervisors, co-workers, and the public does not accurately capture Dr. Haag's findings. For point of reference, Dr. Haag stated,

> [a]t the present time, symptoms are modestly controlled, though they can be triggered by stressful situations, or by crowded public spaces. She does not avoid going into crowded places altogether, but does limit her time there and has learned to talk herself through a more severe panic attack. But at the present time, it is believed that she can tolerate simple social interaction on a limited basis. For

> instance, in small groups of two or three people in a moderately paced environment, she should have little to no difficulties.

(Tr. 323-324).

In other words, Dr. Haag acknowledged that while plaintiff did not completely avoid crowded places, she restricted the length of time that she spent there. To address these symptoms, Haag limited her interaction to groups of two to three people, but did not limit the duration of this contact. In contrast, the ALJ temporally limited Combs to "frequent"[9] interaction with a potentially unlimited number of people. Accordingly, the question becomes whether the ALJ's limitation comports with Dr. Haag's finding.

The court is compelled to answer this question in the negative. In her application of the psychiatric review technique ("PRT"), the ALJ found that in the area of social functioning plaintiff experienced but "mild" limitation, Tr. 22, which, for purposes of the RFC, she transposed into a "frequent" limitation on social interaction. In contrast, both Dr. Haag and the agency psychologist characterized Combs as "moderately" impaired in social functioning. (Tr. 322, 87). Thus, if a limitation to "frequent" social interaction equates to a "mild" limitation of functioning, then it necessarily was less limiting than the findings of the consultative and agency psychologists. However, the ALJ did not provide any grounds for rejecting those segments of the psychologists' findings. The ALJ cannot simply "pick and choose" those portions of the psychologists' findings that support her decision and discard the remainder. *Loza, supra*. Therefore, the court is constrained to find that the ALJ's residual functional capacity assessment is not supported by substantial evidence.

---

[9] "Frequent" is defined as, "occurring from one-third to two-thirds of the time." TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK--THE MEDICAL-VOCATIONAL RULES OF APPENDIX 2, Social Security Ruling 83-10.

## II.    Steps Four, Five and Remand

Because the foundation for the ALJ's step four and alternative step five determinations were premised upon an RFC that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that plaintiff is not disabled, likewise is not supported by substantial evidence.

The courts enjoy the authority to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. 42 U.S.C. §405(g). When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits. *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits). The instant record is not so disposed. Plaintiff's residual functional capacity assessment remains indeterminate, and it is not at all clear that she is disabled under the Act.

## Conclusion

For the foregoing reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.[10]

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have

---

[10] The court need not consider plaintiff's additional arguments. These issues may be addressed upon remand, as needed.

**fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 26th day of July 2017.

_____
KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE